■ In the Matter of JUAN S. AFIF, Petitioner, v COMMISSIONER OF EDUCATION GORDON M. AMBACH et al., Respondents. —Mikoll, J. Proceeding pursuant to CPLR article 78 (initiated in this court pursuant to Education Law § 6510-a [4]) to review a determination of respondent Commissioner of Education which revoked petitioner's license to practice medicine in New York.

Petitioner was charged by the Office of Professional Medical Conduct (OPMC) relating to the alleged sexual abuse of a patient during a gynecological examination. The charges included abusing a patient physically (Education Law § 6509 [9]; 8 NYCRR 29.2 [a] [2]), practicing the profession with gross negligence (Education Law § 6509 [2]), practicing the profession fraudulently (Education Law § 6509 [2]), and engaging in conduct in the practice of medicine which evidenced moral unfitness to practice the profession (Education Law § 6509 [9]; 8 NYCRR 29.1 [b] [5]).

This matter was resolved on a credibility basis. A patient testified that she was suffering from a vaginal infection and that this was a recurrence of a condition previously experienced which had made her seriously ill. She therefore consulted a booklet of participating doctors in her health insurance program and found petitioner's name therein. On October 23, 1985, she dropped into his office without an appointment and requested to be examined later that day. The patient contends that during the examination, petitioner manipulated her labia and front of the vagina, which she thought was odd but she was not sure. He then jumped upon her, placed his penis in her vagina and his head on her chest. She was in a clumsy position to repulse him, but she did finally shove him off. He fell back a foot or two and she then observed his exposed penis. She did not know if he ejaculated. She could not describe his clothes. She told him "You're in big trouble now." He sought to talk to her but she refused to listen and left the premises. The entire incident lasted 5 or 6 minutes.

The patient told her tale to a friend and they called the hotline number for rape crises. A cab was sent for her and she ultimately was examined by Dr. Karen Weiss at Queens Hospital Center within an hour of the alleged event. Weiss, a second-year resident indicated that she found mobile sperm in the patient's vagina, cervical mucous and post fornix. The first

manifestation was indicative of sexual relations occurring within eight hours, while the other evidence indicated that intercourse could have occurred up to 72 hours before the exam. The patient's account to her was that she had her eyes closed during the exam and that, "The next thing I knew, his pants were off and he was inside me."

Petitioner testified that while the gynecological examination was under way, the patient suddenly announced, "I have to leave." He thought the patient was unusually tense throughout the exam and her behavior peculiar. He responded, "Alright," and stepped away to his consulting room. The patient dressed and left. He considered her departure unusual and decided not to forward her pap test to the laboratory for testing. Petitioner indicated that he thought it might not be paid for. Earlier he had expressed some reservations as to the legitimacy of the patient's entitlement to use the health insurance card she presented bearing someone else's name.

Petitioner's receptionist testified that the patient walked into the office without an appointment and was insistent on an examination that day. She characterized her as aggressive and loud. There was a reluctance on the receptionist's part to accept her because of the health insurance card she produced, but, after consulting with petitioner, she was examined. The alleged attack took place in a small examining room located within a few feet of the door beyond which the receptionist sat. The receptionist testified that the walls of the room are not soundproof and that sounds are readily heard from within the examining room. She heard no disturbance, and, when the patient exited, she seemed calm and composed. The patient stopped at the desk to inquire if the health insurance forms were complete and about her card, which the receptionist told her she had previously returned to her. The patient then left.

Character testimony on behalf of petitioner disclosed that he was head of the gynecological department of Union Hospital in The Bronx. His appointment to that position was preceded by an intensive inquiry into his professional competence and moral character. Two physicians and two patients testified as to petitioner's excellent reputation in the community. Petitioner said he was 41 years old, married with three children. He had been practicing for nine years in New York and has treated thousands of women patients in this period without complaint. Both he and the patient were Spanish and their English, though clear, was stilted and grammatically clumsy.

The Hearing Panel indicated that the matter involved a

credibility issue and it found the patient more credible than petitioner. Petitioner was found guilty of all charges and ultimately respondent Board of Regents voted to accept the findings of guilt and agreed with the recommendation to revoke petitioner's license. These findings and the recommendation were then accepted by respondent Commissioner of Education.

Where we have a simple issue of veracity of witnesses, it is for the Hearing Panel to evaluate their credibility. The court will not intrude on the province of the administrative agency and substitute its judgment for that of the agency (see, *Matter of Ahsaf v Nyquist,* 37 NY2d 182). Were the facts of the instant hearing merely a simple and clear credibility issue, and substantial evidence appearing in the record, the matter would not justify further inquiry on our part. However, we note that this matter involves the additional issue of whether this petitioner received a fair hearing.

Prior to the hearing, petitioner's counsel asked the Administrative Law Judge (ALJ) whether he could present evidence to him regarding the fact that the Queens County Grand Jury refused to indict petitioner based on the patient's complaints. This request was denied on the ground that the probative value of the Grand Jury result was outweighed by its possible prejudicial effect to the State. Having recognized the prejudicial effect of the Grand Jury's no bill on the patient's contentions, there also followed a concommitant obligation not to permit damage to petitioner's believability by the suggestion that there were criminal proceedings pending against him. Unfortunately, as the proceeding unfolded, there were numerous references to and suggestions of a criminal proceeding against petitioner. Many were elicited by OPMC's counsel and some were in gratuitous response to legitimate questions by petitioner's counsel.

For instance, Weiss testified, in answer to a question by OPMC's counsel that it was her responsibility to examine victims of sex crimes and that she received special training in completing a "rape kit". She indicated that she had examined 40 to 50 victims of sex crimes and that she was called to examine the patient, "an alleged rape". Weiss was then asked to describe her procedure in examining victims of alleged rape. The medical record of her examination was offered in evidence by OPMC, which discloses that a "rape kit" was completed and "police notified". Thereupon, petitioner's counsel questioned the completeness of the hospital record, but his objection was overruled. A panel member offered the unsoli-

cited observation that "when someone asks [a hospital] for copies of the records for purposes *such as this,* the complete record is forwarded, and one would have to assume that these are the only documents" (emphasis supplied). It was also disclosed by Weiss, in answer to the question of whether she was ever qualified as an expert in a criminal proceeding, that she was allowed to testify to the Grand Jury regarding this incident. The information was gratuitous. Weiss needed only to answer that she had been once so qualified.

Later, Weiss was asked by petitioner's counsel if she had discussed this case with anyone other than OPMC, and she responded, "With the Assistant D.A." Once again, while being asked if she made any research regarding her testimony, she advised petitioner's counsel that she did and added, again gratuitously, "before the case came before the Grand Jury". It was also disclosed that the patient's underwear was examined and submitted for "evidence". In answer to a question of a panel member about other procedures with regard to specimens taken, Weiss said, "I don't know what they do with specimens, very honestly, we seal it and hand it to the police department." The medical records from Queens Hospital Center also contained a waiver form executed by the patient permitting release of information regarding her allegation of rape to the police department.

The issue here was a close question of believability. The ALJ recognized that the revelation that petitioner was cleared of criminal charges could cause incalculable damage to the State's case. Certainly, the revelation that there is or was a criminal proceeding against petitioner was just as disastrous to petitioner's case. When petitioner's counsel was foreclosed from his inquiry, appropriate direction should have been given to OPMC's counsel to forestall revelation to the panel of any criminal proceedings by her witnesses. OPMC's counsel said it best herself, in speaking of the no bill, "it is absolutely not proof of anything, the same way as I would be barred from using a Grand Jury indictment as proof of anything".

The disclosures of the criminal proceeding came during the testimony of Weiss, the expert called on behalf of the State by OPMC. An interesting commentary on the impact an expert has on finders of fact occurred when one of the Hearing Panelists asked Weiss, "Is it your opinion that [the patient] was raped?" The objection to the question was sustained and a further question was answered indicating that Weiss was unable to answer such a question. The inquiry does reflect, however, the reliance unskilled fact finders place upon expert

testimony. The total effect of Weiss' testimony was that a criminal proceeding was under way regarding these same facts. This all tended to bolster the patient's allegations and give them veracity.

In view of the often repeated references to criminal proceedings, out of fairness to petitioner in a close credibility situation, as here, greater care should have been exercised by the ALJ to forestall the prejudice which occurred. We note, too, that no corrective measures were taken to repair the damage. This matter needs to be reheard before a new panel with appropriate measures taken to prevent the prejudicial implications of references to criminal proceedings.

Determination annulled, with costs, petition granted, and matter remitted to respondents for a new hearing before a different panel of the State Board for Professional Medical Conduct. Mahoney, P. J., Casey, Weiss, Mikoll and Harvey, JJ., concur.